IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Criminal Action No. 17-mj-01048-KMT

IN THE MATTER OF THE EXTRADITION
OF GABRIEL RODRIGUEZ CARO,
a/k/a "EL GÜERO"

---

## MEMORANDUM OPINION AND ORDER
---

This matter comes before the court on the Extradition Request filed by the United States on behalf of the United Mexican States ("Mexico"), seeking to extradite Respondent Gabriel Rodriguez Caro, a United States citizen, to Mexico for the aggravated kidnapping of Marlene Paola Ramos Ortega. For the reasons set forth below, the Extradition Request is **GRANTED**, and Respondent is **CERTIFIED** as extraditable.

## APPLICABLE LAW

A request by Mexico to extradite an individual from the United States to that foreign country is governed by the provisions of the federal extradition statute, 18 U.S.C. §§ 3181–3196, and the Extradition Treaty Between the United States of America and the United Mexican States dated May 4, 1978, 31 U.S.T. 5059, TIAS 9656 ("Extradition Treaty"). The extradition process is initiated by Complaint for Arrest for the purposes of Extradition filed by the United States of America ("United States" or "Government"), and an arrest warrant. 18 U.S.C. § 3184. Pursuant to the Extradition Treaty, the diplomatic note and the other supporting documentation were bates labeled with pages 1- 651 and timely produced to the Respondent on May 24, 2017. [Doc. No. 25

at 1.]  *See In re Extradition of Figueroa*, Case No. 12-M-269, 2013 WL 3243096, at *2 (N.D. Ill.

June 26, 2013).   Article 10 of the Extradition Treaty requires the formal extradition request to

include the following:

> a) A statement of the facts of the case;
> b) The text of the legal provisions describing the essential elements of the offense;
> c) The text of the legal provisions describing the punishment for the offense;
> d) The text of the legal provisions relating to the time limit on the prosecution or the execution of the punishment of the offense;
> e) The facts and personal information of the person sought which will permit his identification and, where possible, information concerning his location.

[Doc. No. 25-1, 26].   In addition, when the extradition request relates to an individual who has not

yet been convicted of a crime, it must also include (1) a certified copy of the warrant of arrest

issued by a judge or other judicial officer of the requesting Party; and (2) evidence which, in

accordance with the laws of the requested Party, would justify the apprehension and commitment

for trial of the person sought if the offense had been committed there.   [*Id.* at ¶ 3].   According to

the Extradition Treaty, the documents from Mexico must be presented in English, the language of

the United States.   [*Id.* at ¶ 5].

The next phase of the extradition process is the extradition hearing, which is conducted by

the federal court to consider the evidence presented by Mexico through the United States.   The

extradition hearing is not a criminal trial, and the Federal Rules of Criminal Procedure do not

apply.   Fed. R. Crim. P. 1.   Rather, the purpose of such hearing is to determine whether there is

competent evidence to justify holding the individual to await trial, and not to determine whether

the evidence is sufficient to justify a conviction.   *See Peters v. Egnor*, 888 F.2d 713, 717 (10th

Cir. 1989).   Specifically, under the federal extradition statute, this court hears evidence and

determines whether the evidence presented is sufficient to support a finding of probable cause that the person charged committed the extraditable offense.   18 U.S.C. § 3184; *In re Extradition of Vargas*, 978 F. Supp. 2d 734, 739 (S.D. Tex. 2013).   The court is not authorized under the Extradition Treaty to make a finding of guilt or innocence, and therefore, the Government is not required to present evidence sufficient to convict.

Several principles guide this court's inquiry at the extradition hearing.   First, extradition treaties, unlike criminal statutes, are generally construed liberally in favor of enforcement.   *See Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933) ("In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.")

Next, under the rule of non-inquiry, the court refrains from investigating the fairness of Mexico's justice system, and from inquiring into the procedures or treatment which await Respondent if he is returned to Mexico.   *See Smith v. United States*, 82 F.3d 964, 965 (10th Cir. 1996); *In re Extradition of Chan Seong-I*, 346 F. Supp. 2d 1149, 1157 (D.N.M. 2004).   Under the general rule of non-contradiction, Respondent has no right to pose questions of credibility regarding Mexico's witnesses, but only to explain away or completely rebut probable cause for the purpose of the extradition hearing.   *In re Extradition Vargas*, 978 F. Supp. 2d at 748.

Also, the Federal Rules of Evidence do not control the admissibility of evidence in an extradition hearing. *See* Fed. R. Evid. 1101(d). Instead, under federal extradition law, the admissibility of evidence is controlled by 18 U.S.C. § 3190 and the Extradition Treaty. Section 3190 provides:

> Depositions,[1] warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

18 U.S.C. § 3190. Article 10(6)(b) of the Extradition Treaty provides:

> In the case of a request emanating from the United Mexican States, they are certified by the principle [sic] diplomatic or consular officer of the United States in Mexico.

[Doc. No. 25-1, 27 at ¶ 6(b)]. Once the papers are certified by the diplomatic officer, they are considered properly authenticated and admissible. *See Collins v. Loisel*, 259 U.S. 309, 314 (1922). Neither federal criminal law, nor state criminal law, has any import on the admissibility of documents for the purpose of proving probable cause in an extradition hearing. *See Escobedo*, 623 F.2d at 1103.

If a court determines that there is probable cause to support the underlying charge, the decision to extradite is left to the discretion of the Secretary of State. *See* 18 U.S.C. § 3186. Therefore, it is the Secretary of State, not this court, who considers whether an extradition request

---

[1] The term "deposition" as used in the federal extradition statute refers to an affidavit or a statement under oath. *See Escobedo v. United States*, 623 F.2d 1098, 1103 n.15 (5th Cir. 1980).

should be denied due to humanitarian concerns.[2]  *See In re Extradition Mathison*, 974 F. Supp. 2d 1296, 1315 (D. Or. 2013).

Against this legal background, this court now turns to the request to extradite Gabriel Rodriguez Caro a/k/a "El Guero" to Mexico for the aggravated kidnapping of Marlene Paola Ramos Ortega on August 5, 2014.

## *FACTUAL BACKGROUND*

According to the warrant of arrest the following are the facts of the case:

On August 5, 2014, Patricia Ortega Amparan and Ramiro Ramos Peregrino initiated a complaint regarding their daughter, Ramos Ortega, with whom they had last been in contact on August 1, 2014.   Ortega Amparan and Ramos Peregrino advised that at about 7:23 a.m. on August 2, 2014, they received a text message that read, "we have kidnapped your daughter pay up or we will kill her do not talk to the police or we will kill her."   At 12:09 p.m. the same day, they received a telephone call in which the kidnappers requested 350,000 Mexican pesos for the ransom of Ramos Ortega.

According to Ortega Amparan and Ramos Peregrino, ransom negotiations continued until August 4, 2014, when the kidnappers agreed to accept 62,550 Mexican pesos for the ransom of Ramos Ortega.   The kidnappers instructed Ortega Amparan and Ramos Peregrino to put the money, along with cell phones, jewels, and laptops, inside a bag, go to a specified location, and then call the kidnappers in order to agree on a subsequent location to deliver the ransom.   At the same time, the kidnappers said they would hand over Ramos Ortega.   Ramos Peregrino arrived at

---

[2] See separate Order filed contemporaneously herewith.

the location at approximately 11:00 p.m., dialed the kidnappers cell phone, and did as instructed. Approximately 25 minutes after hanging up with the kidnappers, Ramos Peregrino received a telephone call from the police telling him that they had apprehended Marcos Humberto Reyes Reyes, who had picked up the bag containing the ransom money, and informed her parents that Ramos Ortega had been murdered.

On November 9, 2014, after having been a fugitive for a period of time, Ivan Gonzalez Rodriguez (a/k/a el negro), a confessed member of the group who kidnapped and killed Ramos Ortega, provided a confession to the Public Prosecutor from the Office of the Attorney General of the State of Chihuahua. In his confession, González Rodríguez stated that on August 1, 2014, he and Rodríguez Caro decided to kidnap Ramos Ortega. In accordance with the plan, Rodríguez Caro called Ramos Ortega and asked her to accompany him to collect money he was owed. Ramos Ortega agreed to meet Rodríguez Caro at an agreed location at 4:30 p.m. on that date. Rodríguez Caro and González Rodríguez went to the location, and ultimate victim Ramos Ortega picked them up in her car. The group then picked up Marcos Humberto Reyes Reyes and went to a residence under the pretense that they were going to talk. Once at the residence, Marcos Humberto Reyes Reyes struck Ramos Ortega in the head with a bottle, and Rodríguez Caro and González Rodríguez tied her feet, arms, and head with tape. Rodríguez Caro also took Ramos Ortega's wallet and cellular telephone. González Rodríguez further stated that on August 2, 2014, Marcos Humberto Reyes Reyes called Ramos Ortega's parents to demand ransom for their daughter.

Marcos Humberto Reyes Reyes and Rodríguez Caro engaged in additional ransom negotiations with the victim's parents. On August 3, 2014, González Rodríguez, Marcos Humberto Reyes Reyes, and Rodríguez Caro killed Ramos Ortega by placing plastic bags over her face and strangling her with cables. According to González Rodríguez, on August 4, 2014, Ramos Ortega's parents requested proof that Ramos Ortega was alive. González Rodríguez, Marcos Humberto Reyes Reyes, and Rodríguez Caro took two photographs of Ramos Ortega and Rodríguez Caro sent them to Ramos Ortega's parents to convince them that their daughter was alive. Ramos Ortega's parents agreed to deliver the ransom money. Marcos Humberto Reyes Reyes, accompanied by his two sisters, Jennifer Reyes Reyes and Itzel Reyes Reyes, went to the agreed location to pick up the ransom. Rodríguez Caro and González Rodríguez remained hidden. Rodriguez Caro and González Rodriguez fled the scene when Marcos Humberto Reyes Reyes was arrested.

After his arrest at the scene of the ransom drop, on August 6, 2014, Marcos Humberto Reyes Reyes provided a sworn statement to the Public Prosecutor. Marcos Humberto Reyes Reyes advised that on August 1, 2014, Rodríguez Caro asked him for assistance in picking up a bag with money from a ransom for a girl (Ramos Ortega). According to Marcos Humberto Reyes Reyes, Ramos Ortega was held captive at a residence with her hands, feet, eyes, and mouth bound by tape. Marcos Humberto Reyes Reyes stated that Ramos Ortega was killed because she knew both Rodríguez Caro and González Rodríguez because they were her neighbors.

According to Marcos Humberto Reyes Reyes, on August 4, 2014, Rodríguez Caro instructed Marcos Humberto Reyes Reyes to pick up the bag with the ransom money. Marcos

Humberto Reyes Reyes asked his sisters, Jennifer Reyes Reyes and Itzel Arely Reyes Reyes, to accompany him. When they arrived at the location to pick up the ransom, Marcos Humberto Reyes Reyes was arrested by Chihuahua State police officers.

On July 3, 2015, Jennifer Reyes Reyes and Itzel Arely Reyes Reyes performed identification proceedings in which they identified a photograph of Gabriel Rodríguez Caro as the individual they knew as a friend of their brother, Marcos Humberto Reyes Reyes, and who participated in the kidnapping of Ramos Ortega.

### *EXTRADITION REQUEST*

Several motions were filed by Respondent, including a Motion to Vacate Warrant and Dismiss Complaint [Doc. No. 9], which was denied by the court on April 12, 2017 [Doc. No. 22], and a Memorandum of Law Regarding Bail in International Extradition [Doc. No. 10], seeking release on conditions of bond, which was denied by this court on March 23, 2017 [Doc. No. 14].[3]

The Extradition Hearing was held on October 3, 2017. [Minutes, Doc. No. 39.] In anticipation of the hearing, the United States filed a Pre-Hearing Brief [Doc. No. 25] that contained copies of the formal extradition request, which was presented in hard copy at the time of the Extradition Hearing.[4]

---

[3] Respondent also filed a Restricted Memorandum in Advance of Extradition Hearing [Doc. No. 33], to which the Government responded [Doc. No. 38]. This matter was discussed during the restricted portion of the Extradition hearing and the court intends to issue a separate Order in connection therewith.

[4] For ease of reference, when citing to the contents of Mexico's extradition request, the court will use the copies contained in the record as part of Doc. No. 25 because the documents are sequentially numbered and more easily found. The court will use as page and document reference numbers the designations found at the top of each page which are part of the CM/ECF electronic filing system and available *via* PACER to practitioners. All of the documents in Doc. 25, *et seq.*,

The United States proffered no live testimony, but included within its submissions to the court [Doc. No. 25-1] the Declaration of Tom Heinemann, an official with the Department of State, to which is attached Mexico's formal arrest warrant and supporting evidence.[5]   [Arrest Warrant, Doc. No. 25-1 at 7.]   The Evidence section of the warrant begins at p 13 and references documents attached in a "Sworn Affidavit in Support to the Request for Formal Extradition" that was signed by Rolando Panfilo Morales, an Executive Assistant Public Prosecutor in Mexico, on February 13, 2017.[6]   A copy of the May 4, 1978 treaty between the United States and Mexico is found at Doc. No. 25-1 at 17.

After a lengthy review of the Mexican law and the evidence in the case, the Morales Affidavit attaches twelve exhibits including:

• Morales Exhibit 1 [Doc. No. 25-1, 56 – 25-2, 36.]:   The arrest warrant charging the respondent with Aggravated Kidnapping

• Morales Exhibits 2-3: [Doc. No. 25-2, 38-44]:   The penalty and limitations provisions for the charged crime;

• Morales Exhibit 4: [Id., 45-48]: Record of complaint by Ramiro Ramos Peregrino and Marlene Paola Ramos Ortega, the victim's parents;

---

are found in the same sequence in the original documents, which will be retained in the conventionally filed material in the Office of the Clerk of Court, District of Colorado.
[5] All references in this order are to the English translations of documents which were originally produced in the Spanish language.
[6] The Morales Affidavit begins at Doc. No. 25-1 at 41.

• Morales Exhibit 5: [Id., 49-66]: A police technical report and mapping regarding the collection of ransom/Model Unit for the Attention to the Crime of Kidnapping, including pictures;

• Morales Exhibit 6: [Id. 25-2, 67 – 25-3, 21]: Police report concerning the discovery of the body of the victim, Marlene Paola Ramos Ortega, on August 5, 2014;

• Morales Exhibit 7: [Doc. No. 25-3, 22 – 25-4, 42]: Autopsy report concerning the victim;

• Morales Exhibit 8: [Doc. No. 25-4, 43-47]: The statement of Marcos Humberto Reyes Reyes, a participant in the crime;

• Morales Exhibit 9: [Id., 48-58]: The statement of Ivan Gonzalez Rodriguez, a participant in the crime;

• Morales Exhibit 10: [Id., 59-60]: The death certificate of the victim;

• Morales Exhibit 11: [Id., 61-67]: The photographic identification of Gabriel Rodriguez Caro by Jennifer Reyes and Itzel Arely Reyes, witnesses of the crime; and

• Morales Exhibit 12: [Id., 68-69.] A photograph of Gabriel Rodriguez Caro.

## *FINDINGS*

In an extradition proceeding, the United States must establish that: (1) the court has subject matter and personal jurisdiction; (2) a valid extradition treaty exists between the United States and the foreign requesting state; (3) the required documents were presented in accordance with United States law, translated and duly authenticated by the United States consul; (4) the pending criminal charge in the foreign requesting state is appropriate under the extradition treaty; (5) the Respondent is the person sought; and (6) there is sufficient evidence to establish probable cause

that a crime was committed and that the person before the court committed that crime. *See e.g. In re Extradition of Fuentes*, No. 13-mj-01026-KLM, 2013 WL 2153537 (D. Colo. May 13, 2013); *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182 (W.D. Okla. 2015). The court will address each of these factors in turn.

### A.  Subject Matter and Personal Jurisdiction

The extradition statute expressly permits federal magistrate judges to hear and decide extradition cases if authorized to do so by a court of the United States. 18 U.S.C. § 3184. The Local Rules of Criminal Practice in the United States District Court for the District of Colorado provide, "A magistrate judge may exercise powers and duties necessary to extradite fugitives under 18 U.S.C. §§ 3181-96." D.C.COLO.LCrR 57.1(b)(8). In discharging this authority and duty, the court applies the federal extradition statute and the applicable treaty.

The court has jurisdiction over a fugitive found within its boundaries. 18 U.S.C. § 3184. There is no dispute that Gabriel Rodriguez Caro was found within the jurisdictional boundaries of this court at the time of his arrest. *See* Complaint for Provisional Arrest with a View Toward Extradition (18 U.S.C. § 3184), [Doc. No. 1 at ¶ 10.] Mr. Rodríguez Caro was in custody at the Bureau of Prisons facility in Florence, Colorado in connection with Case No. 3:15-CR-01775-DCG, originating out of the United States District Court for the Western District of Texas at the time of his arrest. Mr. Rodríguez Caro was released from custody by the Bureau of Prisons and was immediately arrested on the provisional arrest warrant in connection with this extradition.

**B.** **Valid Extradition Treaty and Appropriate Authenticated Documents Produced**

The statute limits extradition to instances in which a treaty is in force between the requesting state and the requested state. *See, e.g., Argento v. Horn*, 241 F.2d 258 (6th Cir. 1957). When the government provides a declaration from an attorney in the Department of State attesting that the treaty is in full force and effect, then the Court should extend deference to that determination. *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004). Here, the Declaration of Tom Heinemann, an attorney with the Department of State, verifies that the extradition treaty between the United States and Mexico of May 4, 1978 (TIAS 9656) is in full force and effect. [Doc. No. 25-1, 3 ¶ 3.] Additionally, Mr. Heinemann declares that the Embassy of Mexico has submitted Diplomatic Note No. 02143, dated April 28, 2017, formally requesting the extradition of Gabriel Rodriguez Caro. (*Id*. at ¶ 2.) The Parties do not contest the Extradition Treaty is valid and binds the United States and Mexico, and is in full force and effect as required by the extradition statute at 18 U.S.C. § 3184.

**C.** **Pending Criminal Charge in the Foreign Requesting State Is Appropriate Under the Extradition Treaty**

In the Morales Affidavit, Mr. Morales states that "Gabriel Rodriguez Caro is accused of kidnapping Marlene Paola Ramos Ortega . . ." [Doc. No. 25-1 at 45.] The arrest warrant charges the Respondent with

> the crime of **AGGRAVATED KIDNAPPING** *(SECUESTRO AGRAVADO).*
> Said crime is covered and punishable under Article 9, Section I, paragraph a); in accordance with article 10, section I, paragraph b) and paragraph c), section II, paragraph b) and article 11 of the General Act to Prevent and Punish Kidnapping-Related Crimes *(Ley General para Prevenir y Sasncionar los Delitos en Materia de Secuestro),* which regulates Article 73, Paragraph XXI of the

Constitution of the United Mexican States, in force at the time the facts took place,
. . . .

[Doc. No. 25-1 at 7; Doc. No. 25-2, 40.] Article 9 of the kidnapping statute delineates the basic crime as "[t]o whomever deprives another person of his/her liberty, . . ." (*id*.) and prescribes a basic penalty of "40 to 80 years incarceration" plus fines if the deprivation was perpetrated to obtain a ransom or any other profit. (*Id*.) The punishment for this crime has a maximum imprisonment that is more than one year. Article 10 of the statute prescribes increased penalties for Article 9 violations that occur under the conditions of 1) perpetration of the crime by a group, 2) perpetration of the crime with violence and 3) if the perpetrators are related to or have "ties of friendship, gratitude, trust or a labor relationship with the victim. . . ." (*Id*.) Article 11 prescribes increased penalties for Article 9 violations, whether or not accompanied by sentencing enhancers in Article 10, if the victim is "deprived of his/her life by the Perpetrators or the participants in said crime . . . ." (*Id*.) The enhancement provisions do not alter the basic terms of the crime that kidnapping, according to Mexican law, is to deprive another person of his/her liberty.

Respondent challenges extradition as to what he characterizes as a separate charge – the allegation of kidnapping where the perpetrator or perpetrators are related to, have ties of friendship, gratitude, trust or a labor relationship with the victim or a person related to him. Respondent argues that in Mexico, if that particular element is proved, then a person faces both a higher minimum sentence and a higher maximum sentence than provided for kidnapping without that element and that kidnapping aggravated in this manner is outside

13

the bounds of the applicable extradition treaty.   Mr. Caro contends there is not a similar

statute in the United States.

Treaties can take several forms.   "List treaties" usually contain a list of particular

extraditable offenses or categories of offenses.   Most modern extradition treaties, however,

contain a so-called "dual criminality" provision, providing that extradition must be granted for any

serious offense (or a category of offenses) that is punishable in both the requesting and requested

states.

In Justice Brandeis' opinion in *Collins*, the Supreme Court held that under either kind of

treaty"[t]he law does not require that the name by which the crime is described in the two countries

shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the

same in the two countries.   It is enough if the particular act charged is criminal in both

jurisdictions."   *Id*. at 312.   *See also Bryant v. United States*, 167 U.S. 104, 108, (1897); *Shapiro

v. Ferrandina*, 478 F.2d 894, 907-08 (2d Cir. 1973)

The United States-Mexico Extradition Treaty is a hybrid treaty because it contains both a

list of particular offenses subject to extradition as well as a dual criminality provision.

Article 2(1) of the Extradition Treaty states:

> Extradition shall take place, subject to this Treaty, for willful acts which fall within
> any of the clauses of the Appendix and are punishable in accordance with the laws
> of both Contracting Parties by deprivation of liberty the maximum of which shall
> not be less than one year.

[Doc. No. 25-1, 22.]   The Treaty's Appendix contains a list of enumerated offenses and categories

of extraditable offenses.   (*Id*. at 36.)   Subsection 4 of the Appendix provides that "[k]idnapping;

child stealing; abduction; [and] false imprisonment" constitute extraditable offenses.

14

Defendant argues that Aggravated kidnapping is not listed in Appendix A because if the treaty writers wanted to indicate that a category of offenses related to kidnapping, rather than just one form of kidnapping, they would have used language such as "[o]ffenses against the laws relating to . . ." or "[a]n offense against the laws relating to . . ." kidnapping. (Resp. Brief at 33.) Therefore, Respondent argues that since the words "Aggravated Kidnapping" are not included in the list, it is not an enumerated offense.

The crime of kidnapping is found at 18 U.S. C. § 1201 in the federal statutes. Kidnapping is defined as "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment." The punishment for the United States version of kidnapping has a maximum imprisonment that is more than one year. Very similar to Mexico's kidnapping provisions, there are certain aggravators to the sentences a perpetrator may receive if convicted of kidnapping under various circumstances. *See* Section 2A4.1. Kidnapping, Abduction, Unlawful Restraint, FCJ Federal Sentencing Guidelines Manual (11/1/16), Commentary relying on Statutory Provisions: 18 U.S.C. §§ 115(b)(2), 351(b), (d), 1201, 1203, 1751(b), 2340A.[7]

---

[7] For example the following aggravators are specifically set forth: (1) if a ransom demand was made, increase by 6 levels [referring to levels in the U.S. Sentencing Guidelines with will increase possible punishment as levels ascend]; (2)(A) if the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (3) if the victim sustained serious bodily injury, increase by 2 or 3 levels depending upon the degree of injury; (4) if a dangerous weapon was used, increase by 2 levels; (5) if the victim is held longer than seven or 30 days, increase by 1 or 2 levels; (6) if the victim was sexually exploited, increase by 6 levels; (7) in the case of certain minor victims,

Further, the United States sentencing provisions for all crimes, including kidnapping, lists as an aggravator "[i]f the defendant abused a position of public or private trust, . . . , in a manner that significantly facilitated the commission or concealment of the offense," the punishment Guideline Range will be increased by 2 levels. Section 3B1.3. Abuse of Position of Trust or Use of Special Skill, FCJ Federal Sentencing Guidelines Manual (11/1/16).

"[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relations.'" *United State v. Lui Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (quoting *Laubenheimer*, 290 U.S. at 295). *See also Egnor*, 888 F.2d at 716 ("[W]e are not expected to become experts in the laws of foreign nations." (quotations omitted)).

This court finds that the treaty's inclusion of "kidnapping" as an extraditable offense is sufficient here to satisfy extradition for that crime outside of and including any conditions which may aggravate the sentence if Respondent is convicted of the crime under Mexican law.

The court is similarly unpersuaded by Respondent's argument that because not all the versions of aggravated kidnapping listed in the charges pending in Mexico are substantially analogous to United States' criminal statutes, "the 'essential character' of the acts criminalized by the laws of each country" are not the same under the treaty's dual criminality provision. *See Theron v. U.S. Marshal,* 832 F.2d 492, 496 (9th Cir. 1987), *overruled on other grounds, United States v. Wells*, 519 U.S. 482 (1997).

increase by 3 levels; (8) if kidnapping occurred in the case of another felony or an escape, can be increased up to level 43; (9) if the victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, kidnapping will have the same penalties as First Degree Murder.

As set forth above, all versions of aggravation for the crime of kidnapping alleged against Mr. Rodriguez Caro **are** analogous to the federal sentencing structure applicable to kidnapping in the United States. Therefore, in addition to the crimes under which Mr. Rodriguez Caro stands accused in Mexico being encompassed in the Appendix list of extraditable crimes between Mexico and the United States, those crimes are also included in the Extradition Treaty's dual criminality provision is set forth in Article 2(3). [Doc. No. 25-1, 22.]

### D.    *Identity*

There is no dispute that Gabriel Rodriguez Caro is the individual subject to the formal extradition request. In addition, two witnesses to the crime, Jennifer Reyes and Itzel Arely Reyes Reyes identified Rodriguez Caro in photographic line ups and the court was able to compare the pictures identified by the witnesses to the Respondent sitting in court in Denver, Colorado. *See* [Doc. Nos. 25-4, 64 and 67.] Additionally, as Exhibit 12 to his Declaration, Mr. Morales provided a picture of the wanted individual Gabriel Rodriguez Caro, which the court was also able to compare to the individual sitting in court. This court finds the three photographs all depict the Gabriel Rodriguez Caro who is a respondent in this extradition proceeding. Rodriguez Caro's identity for the purposes of the extradition proceeding has been established.

### E.    *Probable Cause*

Finally, the court turns to whether there is sufficient evidence to conclude that there is probable cause the charged crime of aggravated kidnapping has been committed and that Respondent committed that crime. *See Egnor,* 888 F.2d at 717 ("For a person to be extradited, there must be probable cause to hold him for trial"). The standard of proof for probable cause is

identical to the one used by federal courts in preliminary hearings; therefore, the role of this court is to determine whether there is competent evidence to justify holding the Respondent to await trial in Mexico, not to determine whether the evidence is sufficient to justify a conviction under the laws of either country. *See Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980); *In re Extradition of Fuentes*, 2013 WL 2153537, at *3. A magistrate judge's finding of probable cause will not be disturbed on appeal through a habeas corpus review when "there [is] any evidence warranting finding that there was a reasonable ground to believe the accused was guilty." *Smith*, 82 F.3d at 965 (affirming extradition).

In combination, the Morales Affidavit and its exhibits satisfy the submission requirements of the Extradition Treaty, Article 10, as well as establish probable cause against Respondent for the Mexican crime of Aggravated Kidnapping. Specifically, the witness statements establish probable cause to believe Respondent, who is identified in multiple photo lineups [Doc. No. 25-4, 62 thru 69], on August 1, 2014, kidnapped Marlene Paola Ramos Ortega and thereafter demanded a 350,000 pesos ransom from Ramiro Ramos Peregrino and Marlene Paola Ramos Ortega, her parents. On August 4, 2014, after negotiations, the parents paid 62,550 pesos in ransom by placing the money in a suitcase and following the kidnapper's instructions. [Doc. No. 25-2, 46-47.]

The suitcase containing the ransom money was picked up by Mr. Rodriguez Caro's conspirator, Marcos Humberto Reyes Reyes ("Marcos"). Marcos was arrested after picking up the suitcase and he told the police that Gabriel Rodriguez Caro, who Reyes Reyes also identified by the moniker "El Guero", and Ivan Gonzalez Rodriguez, the third conspirator who was also

known as "El Negro," offered him 1,000 pesos to perform that act.  [Doc. No. 25-4, 44-47.]

Marcos also told the police that he had seen a girl who was blindfolded with her hands feet and

mouth tied up in the house of "el negro."   He also heard that they had killed the girl by suffocating

her because she was their friend and neighbor and, if she had lived, she could have told the police

who had kidnapped her.   (*Id*.)

Ivan Gonzalez Rodriguez was also arrested after being a fugitive for several months and he

provided a statement implicating Gabriel Rodriguez Caro and Marcos Humberto Reyes Reyes.

(*Id*. at 49-57.)   The statement detailed that Gabriel Rodriguez Caro devised a plan to kidnap the

victim.   Rodriguez Caro first enticed the victim to go with them by asking her to drive and help

him pick up some money.   The victim said she would go and she picked up Rodriguez Caro and

El Negro.   They drove to El Negro's residence, where Rodriguez Caro left the victim's car.   At

some point while the three males were inside the house together Gabriel and Marcos confided that

they wanted to kidnap the victim and get ransom for her return.   They all agreed that Marcus

would hit Marlene over the head with a bottle, which he did.   After Marlene was hit, the three of

them dragged her into the house and tied her down.   Rodriguez Caro taped her face and took her

wallet and phone.   The three kept her tied up at El Negro's house while they all made multiple

telephone calls with the victim's family members.   During this time period, the three males,

including Rodriguez Caro drank beer and drove around in a borrowed car and at one point

Rodriguez Caro was reported to have actually left to go to a concert.   At another point, El Negro

stated that he left to go pick up his mother while Marcos stayed with the victim.   After El Negro

came back he and Marcos continued to monitor the victim and reported to Rodriguez Caro that the

victim did not look good and complained of pain and of being cold. The two waited for Rodriguez Caro and when he did not show up after several hours, El Negro and Marcus killed the victim by strangling her with a set of stereo cables. According to El Negro, the victim fought with them until she died. Then, according to El Negro, the two left the victim dead in the house.

Once outside the house, Marcos told his sisters, Itzel and Jennifer, aged 16 and 11 years old, respectively, that he had killed a girl who was a friend of theirs. About an hour after the killing, El Negro reported that Rodriguez Caro returned to the scene. The three worked together to fake some pictures of the dead victim so her family would think she was still alive, then made more calls to the victim's family for money.

El Negro also admitted that when the victim's father showed up with the money for the ransom and left the suitcase and the police caught Marcos picking up the money, Rodriguez Caro and El Negro fled the scene. Rodriguez Caro's father, knowing what his son and others had done, drove the two fugitives to Rodriguez Caro's grandfather's house in La Chavena, where they stayed for a few days until Rodriguez Caro could "cross over" at El Paso with his father.

The kidnapped victim's death is fully reported in the autopsy report and the death certificate, both attached to the Morales declaration.

This court concludes there is sufficient evidence, taken together, to establish probable cause that Respondent committed the crime of which he is accused.

## CONCLUSION

For the foregoing reasons:

This court **CERTIFIES** to the United States Secretary of State that Respondent Gabriel Rodriguez Caro is extraditable for the charged offense of aggravated kidnapping pursuant to 18 U.S.C. § 3184; and

**IT IS ORDERED**

Gabriel Rodriguez Caro is committed to the custody of the United States Marshal for the District of Colorado pending final disposition of this matter by the Secretary of State and surrender to designated agents of the Government of Mexico.

Dated this 19th day of October, 2017.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge